UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LETICIA OLIVAN,

                Plaintiff,                No. 11-cv-13950

vs.                                           Hon. Gerald E. Rosen

Henry Ford Hospital, a Michigan
corporation a/k/a HENRY FORD
HEALTH SYSTEM, INC.,

                Defendant.
_____/

OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on March 29, 2013

PRESENT:   Honorable Gerald E. Rosen
                          United States District Chief Judge

I. INTRODUCTION

The above-captioned action is presently before the Court on the Motion filed by Defendant Henry Ford Hospital a/k/a Henry Ford Health System, Inc. ("HFHS"), seeking entry of summary judgment in its favor on Plaintiff's claims of violation of the American with Disabilities Act (the "ADA"). Plaintiff has responded to Defendant's motion.

Having reviewed the parties' briefs in support of and in opposition to Defendant's motion, as well as the accompanying exhibits and the remainder of the record, the Court

1

finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will resolve the parties' motions "on the briefs." *See* Eastern District of Michigan Local Rule 7.1(f)(2).  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

Plaintiff Leticia Olivan is a former employee of Defendant HFHS.  She began her employment as a Nursing Assistant with HFHS on March 24, 2003.  Her employment was terminated on May 6, 2009 pursuant to HFHS's Progressive Corrective Program[1] for failing to maintain HFHS's patient service standards. These standards include, among others:

- Communication
- Understanding
- Sensitivity

---

[1]  HFHS's "System-Wide Corrective Action Program" sets forth certain standards of conduct for employees and corresponding discipline for violation of these standards. The program provides that less serious misconduct, such as policy violations or performance problems, will typically result in progressive corrective action, which includes:

- Step One    -- Documented Written Counseling
- Step Two    -- Written Warning
- Step Three  --  Written Warning with Suspension
- Step Four   --  Termination

*See* HR Policy 5.17, Defendant's Ex. C.  The policy further provides that "[t]he series of warnings, which result in termination, do not have to be for the same type of violation." *Id.* p. 2.

- Ownership
- Teamwork
- Motivation
- Excellence
- Respect

*See* Nursing Assistant Job Description at Defendant's Ex. D; *see also* Declaration of Gigi Oleson, Defendant's Ex. A, ¶ 3.

In addition to abiding by the patient services standards, Plaintiff's specific job duties as a Nursing Assistant included performing basic nursing procedures, working closely with the nursing staff to plan and implement patient care, and responding to emergent situations as needed.  Because patient care and safety is of paramount importance to HFHS, effective communication is a critical function of the Nursing Assistant position since Nursing Assistants work hand-in-hand with other health care professionals in caring for patients.  Oleson Decl., ¶ 5.  This is particularly true in an emergency, where clear communication is vital to providing prompt and appropriate treatment.  *Id.*

During the course of Plaintiff's employment at HFHS, Plaintiff's direct supervisor was Nurse Manager Susan Markowitz, R.N.  In October 2008, Markowitz began receiving complaints from staff and patients regarding Plaintiff's lack of responsiveness. *Id.* at ¶ 6.  On October 15, 2008, Markowitz notified Plaintiff that patients and staff both had reported that she "ignored" them and their requests, and had walked away without responding to them; and that they had difficulty in getting her attention unless she was looking directly at them.  *See* Defendant's Ex. E.  They also had reported to Markowitz

3

that instructions and requests had to be repeated two or three times to ensure that Plaintiff completely understood what was said. *Id.*

Because Plaintiff's inability to communicate effectively could be detrimental to patient care and safety, Markowitz advised Plaintiff that she had scheduled her for a "fitness for duty" examination because of possible hearing problems. *Id.*

On October 21, 2008, Plaintiff was evaluated by Dr. Daniel Scheer, D.O. as having "decreased hearing." *See* Defendant's Ex. G. Dr. Sheer, however, did not find that Plaintiff was unable to perform her job, nor did he place any medical restrictions on her or recommend any accommodations.[2] *Id.* He did, however, send Plaintiff for an audiogram, and, informed her that if the audiogram was abnormal, he would recommend further evaluation and possible correction of her hearing.

Plaintiff's audiogram did, in fact, return an abnormal result. Consequently, on October 24, 2008, Markowitz advised Plaintiff that, pursuant to Dr. Scheer's recommendation, she "need[ed] to follow up with [her] doctor for correction of her hearing problem." *See* Defendant's Ex. H. Markowitz further indicated that although Plaintiff had decreased hearing, she was cleared to return to work and would be "held to the same standards as everyone else." *Id.*

Plaintiff, however, failed to follow up with her physician or take any other steps to

---

[2] Although Plaintiff states in her Complaint that Dr. Scheer returned her to work "on a limited assignment," *see* Compl., ¶ 11, Dr. Scheer's report does not support that allegation.

4

correct her decreased hearing. As a result, staff and patients continued to complain to Markowitz about Plaintiff's lack of responsiveness and inability to communicate effectively:

- On November 18, 2008, Nurse De'Carla Smith expressed concern about a "communication barrier" with Plaintiff, that she had to repeat her request to do a blood-sugar test on a patient three times, and that she worried that the difficulty in getting Plaintiff to understand what was being said and requested of her could compromise patient safety in urgent situations. *See* Ex. I.

- On December 17, 2008, Charge Nurse Cathy Zamieski emailed Markowitz about an incident in which Plaintiff became irate and confrontational because she did not understand her job assignment. *See id.*

- On December 22, 2008, Nurse Donna Jesionowski noted that Plaintiff's communication problems were delaying patient treatment because she and patients had to repeat instructions and requests to her. *Id.*

In light of these staff concerns, Markowitz counseled Plaintiff in December 2008 about her communication problems and poor work performance and issued her a Coaching Memo outlining areas in which Plaintiff needed to show improvement. *See* Ex. J. The areas noted by Markowitz principally involved the area of communication. *Id.* Despite the counseling and the Coaching Memo, Plaintiff's communication and

performance problems persisted, and staff continued to complain to Markowitz. In February 2009, two more nurses, Imelde Reyes and Mary Arce, separately informed Markowitz that Plaintiff's communication issues were upsetting patients. *See* Ex. I.

Then, on February 26, 2009, Plaintiff was issued a Written Warning -- step two of the HFHS Progressive Corrective Action program -- for failing to complete the annual mandatory educational requirements applicable to all HFHS employees. *See* Defendant's Ex. K.[3]

Soon thereafter, on March 10, 2009, a patient complained that Plaintiff had a "mean attitude" and would not answer her questions. *See* Ex. I. The patient reported several incidents during that one day in which she had to repeat requests or questions three or more times before Plaintiff would respond. *Id*. Following this incident, Plaintiff received a Written Warning with 3 Days Suspension -- step three of the Corrective Action Program. *See* Ex. M. She was counseled and again reminded of her obligations.

Despite this, on March 13, 2009, Nurse Dorothy Moore reported that two of the five patients she was assigned to care for complained to her about Plaintiff. *See* Ex. I. Moore further reported that Plaintiff had ignored her requests to do a patient-related task, and when she asked her why the tasks were not completed, Plaintiff's response was that

---

[3] All HFHS employees are required to complete, on an annual basis, certain educational requirements (*e.g.*, relating to infection control protocols, hygiene protocols, HIPAA requirements), and are given several reminders to complete the mandatory requirements prior to the deadline, which in this case was January 1, 2009. *See* Oleson Decl., ¶ 8. All employees, including Plaintiff, who failed to do so, were issued a written warning under step two of the HFHS Progressive Action Program. *Id.*

6

"[she] didn't hear me." *Id.*

On March 17, 2009, Markowitz and Human Resources Representative Gigi Oleson met with Plaintiff to discuss her performance and communication problems. During the meeting, Plaintiff was placed on a 60-day Performance Improvement Plan ("PIP"). *See* Oleson Decl., ¶ 11. The PIP incorporated the same performance areas that required improvement and were outlined in the December 2008 Coaching Memo. Among the performance goals outlined in the PIP was for Plaintiff to "significantly reduce the number of times co-workers, patients, and/or their families report difficulties in communicating/working with you." *See* Defendant's Ex. N.

Notwithstanding the PIP requirements, Markowitz thereafter continued to receive complaints about Plaintiff's inability to communicate effectively with co-workers and patients. *See* Ex. I. Matters came to a head on April 29, 2009. On that day, a nurse had asked Plaintiff to be sure to save a patient's stool so it could be examined before the patient underwent a colonoscopy. The nurse repeated her request three times and the patient also told her that the stool had to be retained. Nonetheless, Plaintiff disposed of the stool and, when called upon to explain her actions, she responded that she did not recall being asked to save to the patient's stool. *See id.*

Based on this incident, Plaintiff was terminated pursuant to the fourth and final step of the Corrective Action Program.

Plaintiff appealed her termination through HFHS's internal grievance procedure.

7

Plaintiff's termination was upheld through each of the first three steps of the grievance plan. *See* Defendant's Ex. P. Plaintiff thereafter abandoned her appeal. *Id*.

During the appeal process, Plaintiff acknowledged that she "can't hear well," and did not deny that she needed a hearing aide. She further stated that refused to obtain a hearing aid because it "cost too much." *See* Ex. O.

On September 9, 2011, acting *pro se*, Plaintiff instituted the instant American Disabilities Act action.

### III. DISCUSSION

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any

supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply these standards in deciding Defendant's Motion for Summary Judgment in this case.

B.     PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE
       CLAIM OF DISCRIMINATION UNDER THE ADA

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA definition of the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." *Id*. at § 12112(b)(5).

To make out a *prima facie* claim based failure to accommodate, Plaintiff must establish that (1) she has a disability; (2) that she was "otherwise qualified" for the job; and (3) that the defendant either refused to make a reasonable accommodation for her

disability or made an adverse employment decision regarding her solely because of her disability. *See Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) (citing *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir.1996)); *Denczak v. Ford Motor Co.* 215 Fed. App'x 442, 444 (6th Cir. 2007). For purposes of this motion, Defendant assumes that Plaintiff's decreased hearing constitutes a disability under the ADA and argues only that Plaintiff cannot establish the second and third elements of the *prima facie* case.

To meet the second *prima facie* element -- that she is "otherwise qualified" -- Plaintiff must establish (1) that she satisfies the prerequisites for the position she held or the position she desired, "such as possessing the appropriate educational background, employment experience and skills," and (2) that she can perform the essential functions of the position held or desired, with or without accommodation." *Burns v. Coca-Cola Enterprises*, 222 F.3d 247, 256 (6th Cir. 2000).

Essential functions are "fundamental job duties of the employment position the individual with a disability holds." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010) (citing 29 C.F.R. § 1630.2(n)(1)). "Consideration shall be given to the employer's judgment as to what functions of a job are essential. . . . *Id.*

In *Jakubowski*, the plaintiff, a physician, alleged that the defendant hospital failed to accommodate his Asperger Syndrome in violation of the ADA. The defendant presented undisputed evidence demonstrating that all health care professionals worked together in caring for patients, and that the ability to effectively communicate was thus an essential function of the plaintiff's position. The Sixth Circuit agreed:

> Christ Hospital identified communicating with professional colleagues and patients in ways that ensure patient safety as an essential function that Jakubowski must be able to perform. Based on the uncontroverted evidence in the record, it appears that many healthcare professionals work together to care for a single patient. The ultimate success of that care requires the patient, physicians, nurses and technicians to communicate clearly with each other, or else, patients could be harmed or even die. Further as the employer, Christ Hospital's identification of these functions as essential should be given some consideration. *See* 42 U.S.C. § 12111(8). Accordingly, we agree that there is no dispute that these functions are essential to the work of a family practice physician residency training program.

627 F.3d at 201-202. *See also, Collis v. Gwinnett County*, 156 F. Supp. 2d 1342, 1349 (N.D. Ga) (finding that plaintiff, a paramedic with a hearing impairment, was not otherwise qualified because he could not "alert and react to emergency communications, a necessary part of being a paramedic.")

As in *Jakubowski*, the record evidence in this case establishes that one of the main functions of a Nursing Assistant is to work closely with other health care professionals to develop and implement patient care. *See* Nursing Assistant Job Description, Defendant's Ex. D. Fundamental to performing this function is the ability to communicate effectively with nurses, doctors and patients. *See* Oleson Decl., ¶ 5. Thus, as in *Jakubowski,* an essential function of the Nursing Assistant position at HFHS is the ability to communicate with co-workers and patients in a manner that ensures patient care and safety are maintained. *Id.*

Furthermore, like the plaintiff in *Jakubowski*, Plaintiff here acknowledged that she "can't hear well," which would undisputedly prevent her from effectively communicating

11

with co-workers and patients, and the numerous documented complaints from both staff and patients attest to these difficulties. Because Plaintiff admittedly had difficulty performing these functions, some kind of accommodation would be necessary for her to continue his work. *See* 42 U.S.C. § 12112(b)(5)(A). Thus, whether Plaintiff was a qualified individual depends on whether she proposed a reasonable accommodation to account for her disability. *Jakubowski*, 627 F.3d at 202.

It is well-settled that if a disabled employee requires an accommodation, she bears the burden of proposing an accommodation and proving that it is reasonable. *Jakubowski* at 202-203; *see also Monette v. Electronic Data Systems, Corp.*, 90 F.3d 1173, 1183 (6th Cir. 19965); *Lockhard v. General Motors Corp.*, 52 Fed. App'x 782, 786 (6th Cir. 2002). The employee further bears the burden "of proving that [she] will be capable of performing the essential functions of the job with the proposed accommodations." *Id*.

Here, the only accommodation Plaintiff proposed to HFHS was that her co-worker and patients speak louder when addressing her and wave their hands to get her attention. *See* Oleson Decl., ¶ 10. Speaking louder and waving hands, however, is not a reasonable accommodation for a number of reasons. First, from a patient service standpoint, HFHS cannot expect patients who have come to the hospital seeking medical treatment to have to shout and wave their hands in order for their requests to be heard or their questions answered. *Id.* Moreover, in an emergency situation, when time is of the essence, requiring medical staff to remember to speak louder to Plaintiff, or to take the time to wave their hands to get her attention, may not be practical or possible, and would delay or

compromise patient care. *Id.* Furthermore, there is no assurance that speaking louder or waving hands would resolve Plaintiff's communication problems because co-workers complained that despite yelling at Plaintiff, the communication problems persisted. *See* Ex. I.

Thus, not only is Plaintiff's proposed accommodation unreasonable, but there is no evidence that it would permit Plaintiff to perform the essential function of communicating effectively.

In her Complaint, Plaintiff also alleged that she requested an accommodation "recommended by a physician" -- whom she does not identify -- and suggests that she sought reassignment to accommodate her, but that request was rejected. Plaintiff was asked during discovery to provide all evidence supporting this allegation (and the other allegations in her Complaint, as well), and though Plaintiff produced a number of documents, *see* Defendant's Ex. O, she did not produce any evidence to support the allegation that she requested and was denied a physician-recommended accommodation. *See id.; see also* Oleson Decl., ¶ 12.[4]

The foregoing record evidence establishes that Plaintiff has failed to carry her burden of proposing a reasonable accommodation, and since the undisputed evidence shows that Plaintiff could not perform the essential functions of a Nursing Assistant,

---

[4] Plaintiff did produce, in response to the particular Request to Produce, a letter from an attorney (who apparently had represented Plaintiff
in connection with negotiating an unrelated request for FMLA leave), but there is no request for an ADA accommodation in that letter, either.

Plaintiff is not "otherwise qualified" for the position. As such, she has failed to make out a *prima facie* ADA claim.

However, even assuming *arguendo* that Plaintiff had made out a *prima facie* case, her claim of discrimination under the ADA would still fail. In deciding claims of employment discrimination under the ADA, the Sixth Circuit applies the familiar *McDonnell Douglas*[5] burden-shifting paradigm. Under the *McDonnell Douglas* framework, once a plaintiff makes out a *prima facie* claim of discrimination the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56, 101 S.Ct. 1089, 1094-95 (1981). If the defendant offers a legitimate reason, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reason offered by the defendant was not its true reason but was a pretext for discrimination. *Burdine, supra*, 450 U.S. at 253; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-508, 113 S.Ct. 2742, 2747-48 (1993); *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 142, 120 S.Ct.2097, 2106 (2000).

In this case, Defendant has proffered a legitimate, nondiscriminatory reason for terminating Plaintiff's employment -- she progressed through all of the steps of HFHS's Corrective Action Program. Therefore, to withstand summary judgment, it is Plaintiff's burden to demonstrate that Defendant's proffered reason is pretextual.

---

[5] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

"To establish pretext, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate his discharge, or (3) that it was insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *see also Gray v. Toshiba Am. Consumer Prod.*, 263 F.3d 595, 600 (6th Cir. 2001); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 565, 576 (6th Cir. 2003).

Plaintiff here cannot show that the HFHS's stated reason had no basis in fact. To do so, Plaintiff would have to prove that "the proferred bases for the plaintiff's discharge never happened, *i.e.,* that they are factually false." *Lamer v. Metaldyne Co., LLC*, 240 Fed. App'x 22, 30-31 (6th Cir. 2007) (citing *Manzer*, *supra*). Here, Plaintiff has not done so. She does not dispute that she was counseled, warned, reprimanded, and suspended, and progressed through the four-step Corrective Action Program prior to her termination.

Nor has Plaintiff shown that HFHS's reason was insufficient to, or did not actually motivate, her discharge. Plaintiff has not identified a single non-disabled employee that progressed through the corrective action steps, but was allowed to remain employed, nor has she identified a single non-disabled employee that engaged in the same or similar misconduct that was not disciplined. *Lamar, supra* at 30. In fact, HFHS has produced evidence showing that it has previously terminated non-disabled employees who progress through all of the corrective action steps, has disciplined non-disabled employees for failing to maintain the Standards of Service Excellence, and has disciplined non-disabled

15

employees for not completing their mandatory annual education requirements. *See* Oleson Decl., ¶ 13. And, Plaintiff has no "additional evidence ... of discrimination" to prove that HFHS's reasons did not actually motivate its decision to terminate her employment. *Parries v. Makino, Inc.*, 148 Fed. App'x 291, 299 (6th Cir. 2005).

For all of the foregoing reasons, the Court concludes that Plaintiff has failed to establish that HFHS failed to accommodate her or otherwise discriminated against her in violation of the Americans with Disabilities Act. Therefore, the Court will grant Defendant's Motion for Summary Judgment.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment **[Dkt. # 13]** is GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED, in its entirety, with prejudice.

Let Judgment be entered accordingly.

        s/Gerald E. Rosen
        Chief Judge, United States District Court

Dated: March 29, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 29, 2013, by electronic and/or ordinary mail.

        s/Julie Owens
        Case Manager, (313) 234-5135